### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOE JOHNSON** )<br>)<br>Plaintiff, )<br>)<br>VS. )<br>)<br>**UNITED STATES OF AMERICA** )<br>)<br>Defendant. ) | CIVIL ACTION NO. **2:22-cv-02905-JS** |

### FIRST AMENDED COMPLAINT

Plaintiff, Joe JOHNSON, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, files this First Amended Complaint, and represents to the Court, that:

### JURISDICTION

1. This Court has subject-matter jurisdiction over this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346, in that the claims alleged against the Defendant, United States of America arises out of the negligent or wrongful acts and omissions of employees of the Government while acting within the scope of his or her office or employment.

2. This Court further has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. §1331, as this case involves questions of federal law.

### PARTIES

3. Plaintiff is a resident of the State of Maryland residing in Prince George's County.

4. Defendant United States of America is sued under the Federal Tort Claims Act for the negligent, wrongful acts and omissions of employees of the SCP Schuylkill, an agency of the Defendant, while acting within the scope of their office and employment.

## FACTS COMMON TO ALL COUNTS

On June 27, 2019, Linwood Clinton Wright, Jr. ("Wright") made a charging decision to go before a federal grand jury sitting in the Eastern District of Pennsylvania to obtain a two-count indictment charging a Joseph R. Johnson, Jr. with one count of false statements and aiding and abetting, in violation of 18 U.S.C. §§1001 and 2, and one count of aggravated identity theft and aiding and abetting, in violation of 18 U.S.C. §§1028A and 2, arising out of an alleged false filing that allegedly occurred in the Federal District Court in the Eastern District of Pennsylvania on or about February 1, 2016. Wright knew or he should have known that there was no evidence of "materiality" which was a necessary and required element to constitute a federal crime under the statute for which he obtained the indictment under 18 U.S.C. §1001. Upon information and belief, during the course of his investigation, Kurt Leonard Kuechler ("Kuechler"), fabricated evidence that was intended to link the Plaintiff to the alleged false filing by planting Plaintiff's fingerprints on pieces of tape on the outside of the envelope containing the false filing, and then manufacturing a document that was described as "Devout Player Hater Internet Post (2001 Honda Accord EX V6 power steering)", which was purportedly an internet posting that the Plaintiff allegedly authored that never existed. During the course of the trial, Wright, having direct and specific knowledge or who should have had knowledge of the fabricated and manufactured evidence, elicited and suborned perjured testimony from Kuechler about the false evidence and proffered the fabricated evidence into evidence at the trial to establish a causal link between the Plaintiff, the Devout Player Hater character, and the purported false filing. On November 14, 2019, a petit jury relied on the fabricated and manufactured evidence to convict the Plaintiff of the baseless charges, and on February 28, 2020, Plaintiff was sentenced to 32 months' imprisonment, to be followed by a three-year term of supervised release and a $200 special assessment.

On March 13, 2020, Plaintiff's timely amended notice of appeal was received by the United States Court of Appeals for the Third Circuit. Beginning on August 10, 2020, Plaintiff began serving the term of imprisonment at the Schuylkill Federal Prison Camp in Minersville, PA, and while confined there, Plaintiff was exposed to extremely dangerous prison conditions. Specifically, the novel coronavirus known as SARS-nCoV-2 causes COVID-19, a deadly respiratory infection for which no known cure or vaccine was available. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. At that time, the United States registered 1,267 of the 118,000 confirmed global cases and 38 of the 4,291 deaths. The virus is highly infectious. The virus spreads primarily through close contact with an infected person (who may be asymptomatic), including through respiratory droplets produced when the infected person coughs, sneezes, or talks. The virus can also spread through contact with a contaminated surface.

It is universally recognized that COVID-19 poses a particularly tough challenge for the incarcerated citizenry. Social distancing and rigorous personal hygiene remain important combatants to the virus but those housed in prisons, like the Plaintiff, must eat, sleep, talk, and tend to their every personal need in each other's close physical space. COVID-19 is especially deadly for the detained population because they are disproportionately more likely to suffer from chronic medical conditions. In recognition of this stark reality, the Center for Disease Control ("CDC") on March 23, 2020, issued guidance for officials operating detention facilities to help stop the spread of COVID-19. (CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities). The guidance included detailed recommendations about proper hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine.

The CDC's guidelines provided a useful benchmark in determining whether the Facility's policies and procedures are appropriate. Thus, the standard precautions to prevent the spread of the virus in a correctional setting, such as SCP Schuylkill, include: limiting operational entrances and exists to the facilities and restricting transfers of detained persons unless necessary to prevent overcrowding; performing pre-intake screening for temperature checks for incoming detainees to identify and address both symptomatic individuals and asymptomatic individuals who had recent close contact to a known COVID-19 case; increasing cleaning and disinfecting frequency for high touch areas; encouraging all staff and detainees to wear a cloth face covering as much as possible; reinforcing healthy hygiene practices amongst the detainee population; providing soap, running water, cloth face masks, and tissues to detainees; implementing "social distancing" strategies to increase the physical space between incarcerated persons, knowing 6-feet distance is not always possible in a correctional setting; suspending or limiting activities that would likely involve participants being in "closer contact than they are in their housing environment;" and performing daily temperature checks in housing units where COVID-19 cases have been identified.

The CDC further recommended that management in a correctional facility: (a) provide no-touch receptacles; (b) alcohol-based sanitizer where permissible based on security restrictions"; (c) education on mask wear and symptoms; (d) suspend or modify visitation programs where able, promote non-contact visits, and require visitors to wear cloth face coverings and perform verbal screening and temperature checks upon entry; and (e) display educational signage in multiple languages. The CDC also prescribes quarantine and isolation practices for infected detainees as well as testing and contact tracing whenever feasible. Numerous factors can increase a person's risk of severe illness if he/she contracts the virus.

The following medical conditions put a person at an increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic obstructive pulmonary disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, including, type 2 diabetes mellitus. Coronavirus Disease 2019 (COVID-19), "People with Certain Medical Conditions," Centers for Disease Control and Prevention (Nov. 2, 2020).

Persons who have the following medical conditions might be at an increased risk: asthma, cerebrovascular disease, cystic fibrosis, hypertension, immuno-compromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus. Being a former cigarette smoker places one at a high risk of getting severely sick from COVID-19. Finally, racial, and ethnic minorities may also be at an increased risk due to societal inequities, such as access to health care and poorer living conditions. Coronavirus Disease 2019 (COVID-19), "Health Equity Considerations and Racial and Ethnic Minority Groups," Center for Disease Control and Prevention (July 24, 2020).

In recognition of the CDC's guidance, the Federal Bureau of Prisons ("BOP") purportedly took the following steps to combat the virus. On March 13, 2020, the BOP modified the operations in accordance with its "COVID-19 Action Plan." Initially, all social visits, inmate movement, and official staff travel were supposed to be suspended for thirty days. Contractors who enter any BOP facility were supposed to be screened for the virus, and initially admission was supposed to be limited to contractors who performed essential services, and enhanced health screenings for staff in areas of "sustained community transmission" was supposed to be conducted and all new inmates were supposed to be screened for virus "exposure risk factors and symptoms." Any inmate who was asymptomatic but had a risk of exposure was supposed to be quarantined.

The quarantine period was supposed to be for a minimum of fourteen days or until cleared by medical staff, and new inmates who were symptomatic were supposed to be placed in isolation until they tested negative for the virus or were cleared by medical staff. In addition, group gatherings were supposed to be limited to permit social distancing as much as possible, all staff and inmates were supposed to be issued face masks, and all staff and inmates were supposed to be encouraged to wear face masks when social distancing could not be achieved.

The BOP did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplated religious exemptions, medical exemptions, and outright refusals to comply with the mask mandate. Further, BOP employees were permitted to continue working even after contracting the COVID-19. The BOP, and employees at SCP Schuylkill were aware of the risks posed by COVID-19 as early as January 2020. The BOP COVID-19 Pandemic Response Plan was developed as a policy that was specifically designed to prescribe the course of action for all BOP employees to follow to prevent the spread of contagious diseases such as the deadly coronavirus into prison facilities but employees at SCP Schuylkill failed to follow it.

Despite being fully aware and cognizant of the risks posed by the virus, employees at SCP Schuylkill failed to follow any of the basic recommendations of the CDC, and did not follow the BOP-COVID 19 Pandemic Response Plan policy to prevent the spread of the coronavirus into the SCP Schuylkill facility, and otherwise, failed to take the necessary precautions to prevent the spread of the virus at SCP Schuylkill. As of November 10, 2020, the BOP COVID-19 statistics were as follows: (1) 2,455 inmates and 981 staff had confirmed positive tests; (2) 17,067 inmates and 1,543 staff had recovered and (3) 135 inmates and 2 staff had died. FCI Schuylkill – where Plaintiff was housed at the adjacent satellite camp, SCP Schuylkill – had as of November 11, 2020, 4 positive cases among staff, as well as 1 inmate and 1 staff member who had recovered.

6

FCI Schuylkill later became the epicenter for the coronavirus as employees were permitted and/or required to continue working even after contracting and/or being exposed to the virus which caused it to then spread into the facility among other individuals. On August 10, 2020, Plaintiff was placed in the custody and care of the BOP, and was housed at the SCP Schuylkill satellite camp to begin serving the federal sentence. At the time of his arrival, Plaintiff was about 5 feet 6, weighed about 180 pounds with a BMI of more than 30. Employees at SCP Schuylkill knew that a BMI of 30 or higher puts one in the "obese" category per the CDC, and that with a BMI of at least 30, the Plaintiff was obese and at risk of getting severely sick. Employees at SCP Schuylkill also knew that the Plaintiff's obesity, his race, and being an ethnic minority placed him at a higher risk of severe illness or death if he were to be exposed to and contracted COVID-19.

Prior to December of 2020, Plaintiff tested negative for the COVID-19 virus. In late December of 2020, a massive COVID-19 outbreak occurred at the main FCI Schuylkill campus that resulted in at least 160 inmates testing positive for COVID-19. On December 23, 2020, the COVID-19 outbreak made its way to SCP Schuylkill from employees that showed up for work with coronavirus type symptoms resulting in inmates as well as staff testing positive for the virus.

Despite the fact that the main FCI Schuylkill institution was the epicenter of the coronavirus, Plaintiff was forced there by BOP staff against his will, which was a housing facility at a much higher security level than he should have been exposed. Plaintiff initially tested negative for the virus on December 23, 2020 before being forced into the epicenter of the coronavirus, and while he was housed there against his will, Plaintiff was exposed to the coronavirus. Employees at SCP Schuylkill failed to take any precautionary measures to prevent or stop the spread of the virus and continued working after testing positive for the virus and failed to follow the BOP mandatory COVID-19 policy to prevent the spread of the virus into the SCP Schuylkill facility.

7

As a result of this persistent course of action, on March 2, 2021, and on September 1, 2021, Plaintiff was exposed to and placed at risk of contracting the coronavirus after multiple staff tested positive for COVID-19 at SCP Schuylkill who were required to continue working after exposure; thereby spreading the virus to other individuals at the facility, including, exposing it to the Plaintiff.

On June 25, 2021, Plaintiff submitted an Administrative Tort Claim to the BOP pursuant to the Federal Tort Claims Act for exposure to dangerous prison conditions as a result of the failure of employees at SCP Schuylkill to, among other things, follow mandatory health and safety protocols to prevent the spread of a contagious disease. Meanwhile, on November 23, 2021, Plaintiff's convictions and sentence were reversed on the ground that he was not guilty of the offense of which he was unjustly convicted and the alleged conduct for which he had been falsely accused constituted no offense against the United States. Significantly, in reversing his unlawful conviction, the Third Circuit noted that "Johnson's behavior wasted public time and resources and distracted court officials from their work. But only Congress enjoys the authority to turn conduct into a federal crime." *United States v. Johnson*, 19 F.4th 248, 263 (3rd Cir. 2021).

Citing *Berger v. United States*, 295 U.S. 78, 88 (1935), the Third Circuit painstakingly commented on the Government's conduct in bringing the prosecution as follows:

> "for bad acts to constitute crimes, at trial the Government must prove each element beyond a reasonable doubt. This is because the Government, through the United States Attorney, "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."" "That ancient guarantee was not honored." *Id.*

On January 4, 2022, in accordance with the November 23, 2021 published opinion and the December 9, 2021 judgment of the Court of Appeals for the Third Circuit, the district court entered a final judgment of acquittal. By letter dated February 11, 2022, Plaintiff's Administrative Claim was denied by the BOP. *See* **Exhibit** A. Plaintiff now brings this action to seek redress.

8

## COUNT ONE
(Negligence)

5. Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

6. At all times relevant, Plaintiff was confined at SCP Schuylkill in Minersville, PA serving a federal sentence.

7. Pursuant to 18 U.S.C. §4042, Defendant owed Plaintiff a legal duty of care, as a federal prisoner in its custody to, among other things, "provide suitable quarters, and provide for the safe keeping, care and subsistence of all persons charged with or convicted of offenses against the United States." This duty of care required the Defendant to protect the Plaintiff from the exposure to dangerous prison conditions including the coronavirus.

8. BOP COVID-19 Action Plan also required that employees at all BOP facilities, including, SCP Schuylkill, enforce and strictly follow CDC guidelines to prevent the spread of the virus into the facility. SCP Schuylkill and its employees knew or should have known about the risks and dangers of the virus, but failed to do anything to prevent the spread of it into the facility. Based upon information and belief, employees at SCP Schuylkill negligently or intentionally destroyed records that documented staff with related coronavirus type symptoms so infected staff could continue working after contracting and testing positive for the coronavirus, thereby introducing the virus into the facility and spreading it among other individuals at SCP Schuylkill.

9. SCP Schuylkill and its employees breached its duty of care by, among other things, failing to provide suitable quarters and provide for the safekeeping, and care of the Plaintiff, including, failing to follow the mandatory BOP-COVID 19 Pandemic Response Plan policy to prevent the spread of the coronavirus into the SCP Schuylkill facility, and otherwise, failing to take the necessary precautions to prevent the spread of the virus at SCP Schuylkill.

10. SCP Schuylkill and its employees further breached its duty of care by otherwise failing to adequately protect the Plaintiff from the exposure to dangerous prison conditions including the coronavirus, and negligently or intentionally destroying records that documented employees with coronavirus symptoms that permitted them to continue working even after contracting the coronavirus; thereby spreading and exposing the virus to other individuals, including, to the Plaintiff on multiple occasions between August 2020 and November 2021.

11. As a direct and proximate result of the breach, Plaintiff was injured and sustained damages. Plaintiff suffered, and continues to suffer, among other things, loss of sleep, worriation, depression, anxiety, and other known and unknown complications after being exposed to the coronavirus on multiple occasions, while in the Defendant's care and custody.

## COUNT TWO
(Negligent Infliction of Emotional Distress)

12. Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

13. Defendant, SCP Schuylkill, and its employees created a zone of physical danger when it failed to, among other things, follow national guidelines in the prevention and testing for COVID-19, including, failing to follow a mandatory policy, and by otherwise failing to adequately protect the Plaintiff from the exposure to dangerous prison conditions such as the coronavirus.

14. Defendant, SCP Schuylkill, and its employees knew that the Plaintiff was obese, and that he was at a higher risk of severe illness or death if he was exposed to COVID-19. Plaintiff was repeatedly exposed to the coronavirus, and suffered immediate and substantial physical harm.

15. On March 2, 2021, and again on September 1, 2021, Plaintiff was exposed to and placed in constant fear of contracting the coronavirus and being infected by it after multiple outbreaks of the virus at SCP Schuylkill occurred as a direct result of the conduct of BOP staff.

16.     Plaintiff sustained severe emotional distress, loss of sleep, worriation, depression, anxiety, mental anguish and continued to be exposed to and placed in constant fear of being infected with the virus that was likely to cause severe physical harm, severe illness, or even death.

## COUNT THREE
(Intentional Infliction of Emotional Distress)

17.     Pleading further and in the alternative, at all times relevant, employees at SCP Schuylkill, deliberately and intentionally destroyed records that documented staff with related coronavirus type symptoms so that they could continue working, and then knowingly and willfully failed to follow mandatory BOP policy to prevent the spread of the coronavirus into the facility.

18.     At all times relevant, employees at SCP Schuylkill knew that a BMI of 30 or higher puts one in the "obese" category, and that with a BMI of at least 30, Plaintiff was obese, and at risk of getting severely sick. Employees at SCP Schuylkill also knew or should have known that Plaintiff was at high risk of severe illness or death if he were to be exposed to the coronavirus.

19.     On December 23, 2020, despite the fact that the main FCI Schuylkill institution was the epicenter of the coronavirus, employees at SCP Schuylkill being fully cognizant of the risks, forced the Plaintiff into that facility under direct threat, duress and against his will for the sole purpose and with the specific intent of exposing him to the coronavirus so that he could contract the virus and become severely ill and suffer death from exposure to the deadly disease.

20.     This conduct was perpetrated by the agents, servants, and employees of the Defendant within the scope of their employment. Defendant is liable for all of the acts committed by its agents, servants, and employees within the scope of their employment.

21.     Defendant's employees' conduct at SCP Schuylkill as described in the preceding paragraphs was extreme and outrageous and was done intentionally, recklessly, in bad faith and in deliberate disregard of a high degree of probability that emotional distress would result to Plaintiff.

22. Defendant's employees knew or should have known that their conduct would or could cause emotional distress upon the Plaintiff, and it did cause emotional distress upon Plaintiff.

23. Defendant's employees' conduct was malicious, willful, deliberate, and intentional and was done for the sole purpose of inflicting severe emotional distress and harm upon Plaintiff.

24. As a result, Plaintiff has suffered physical harm due to the defendant's employees' outrageous conduct, including, but not limited to loss of sleep, headaches, severe mental pain, depression and will continue to suffer severe and extreme emotional distress, loss of sleep, headaches, severe mental pain, and depression as a result of the Defendant's employees' conduct.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment in his favor on his claims asserted against Defendant United States of America, in the amount of Two Hundred Thousand ($200,000) Dollars, as and for compensatory damages.

a) An award of general and special damages for the Defendant's wrongful, reprehensible and outrageous conduct, and to deter the Defendant's future reprehensible and outrageous conduct;

b) An award of costs and reasonable attorney's fees incurred in this action; and

c) For such further and other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on each and every issue triable herein by jury.

Respectfully submitted,

*/s/ Joe Johnson*
JOE JOHNSON
POST OFFICE BOX 441572
FORT WASHINGTON, MD   20749

**CERTIFICATE OF SERVICE**

   I hereby certify that on October 10, 2022, I caused to be electronically filed the foregoing document through the Court's Electronic Case Filing (NextGen CM/ECF) system which will in turn send notification of such filing to all registered filers and upon Filing User Rebecca S. Melley, Assistant United States Attorney.

                 */s/ Joe Johnson*
                 JOE JOHNSON